## Estate of Edward G. Whitman, Deceased.    Appeal of Mary Estelle Powell.

*Executors and administrators—Continuation of business by direction of testator—Will.*

Where executors, under a mandatory direction in the will, continue testator's business, which is not in a prosperous condition, owing to business depression and unexpected difficulties, and in entire good faith and with at least ordinary prudence borrow money to carry it on, they cannot be surcharged with a loss in the business, at the instance of a distributee who had drawn her share of the profits as long as profits were made, and when the business became embarrassed urged the executors to borrow money to save it.

Argued Jan. 10, 1900.    Appeal, No. 210, Jan. T., 1899, by Mary Estella Powell, from decree of O. C. Phila. Co., dismissing exceptions to adjudication.    Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN, FELL, BROWN and MESTREZAT, JJ. Affirmed.

Exceptions to adjudication.

The facts appear by the adjudication of PENROSE, J., which was as follows:

The decedent, a widely known manufacturer of high grade confectionery, doing business for many years at 812 Chestnut street, died December 6, 1892, leaving a widow, Susanna Whitman, and three children, Edward G. Whitman, Jr., Mary E. Powell and Ann E. Whitman.

By his will, proved December 15, 1892, he directed the payment of his debts and funeral expenses " as soon as convenient after " his death, and after a specific gift of all his household goods and furniture to his wife, gave the residue of his estate, real and personal, one third to his wife and two thirds, in equal shares, to his said children, providing, however, as to his business as follows:

" I order and direct that in case my son, Edward G. Whitman, Jr., shall be living at the time of my decease, that my confectionery business, in which I am now engaged, with the stock, capital and property thereof, the whole of which is my absolute property, shall be managed and conducted by my

executors or the survivors of them for the period of two years from the time of my decease, and I order and direct that in such case the entire stock, capital and property (exclusive of the good-will of the same) shall be appraised and the value thereof determined as soon as convenient after my decease by three disinterested persons familiar with the nature thereof, one of whom shall be chosen by my said son, one other of them shall be chosen by my said wife and daughters or their legal representatives, and the two persons thus chosen shall choose the third person for the purposes aforesaid, and from the profits thereof I order and direct that my estate shall receive for the purpose of distribution interest at the rate of six per cent. per annum on such appraised and determined value thereof, and that the residue of the said profits shall be distributed as follows, to wit: Twenty per centum thereof annually to my said wife, Susanna Whitman, ten per centum thereof annually unto my said daughters, Mary Estelle Powell and Ann Elizabeth Whitman, respectively, and the remaining sixty per centum thereof annually to my said son, Edward G. Whitman, Jr., during the said period of two years; and I order and direct that the stock, capital and property of my said business shall be maintained by my said executors during the said period of two years in the same relative condition as to value as the same shall be at the time of my decease, and at the expiration of said period of two years I order and direct that my said son, Edward G. Whitman, Jr., shall have the right and privilege of taking or purchasing my said business, including the stock, capital and property thereof, at the appraised and determined price or valuation made thereof as aforesaid, the good-will thereof to be included for the said price in case the said business shall be taken or purchased by him, and that the proceeds thereof shall be considered as part of my estate and shall be divided between my said wife and children in the manner and proportions set forth in the second item of this will. And in case my said son shall die within the said period of two years or before the purchase of my said business shall be fully perfected by him, or in case he shall decline to join with the other executors in the management of the same during said period as above set forth, then and in such case I order and direct that my said business, including the stock, capital, property and good-will thereof, shall be coverted accord-

ing to law, and that the proceeds thereof shall be considered as part of my estate and shall be divided between my said wife and children in the manner and proportions above set forth.

"And for the payment of my debts and the distribution of my estate, I order and direct that my executors . . . . shall sell and dispose of all my real estate wherever situate at public or private sale as they may deem most expedient with full authority to execute . . . . deeds of conveyance to the purchaser or purchasers thereof . . . . the proceeds of all such sales to be used and applied according to the uses, ends, intents and purposes set forth and declared in this my last will and testament.

"And lastly, I nominate, constitute, and appoint my said wife, Susanna Whitman, my said son, Edward G. Whitman, Jr., and my said daughter, Ann Elizabeth Whitman, the executors of this my last will and testament."

The entire estate of the testator consisted of his household furniture, etc., appraised at $7,520.70, specifically bequeathed to his wife; three vacant lots in West Philadelphia, directed to be sold as above, and the stock, fixtures, book accounts, etc., of his business, appraised at $26,746.49, viz: stock at store, $5,583.67; machinery and fixtures, $14,201.62; book debts, considered good, $3,882.39; book debts, considered doubtful, $463.60, and cash on hand January 1, 1893, $2,615.21 (the good-will, by the express provisions of the will, not being appraised, though it was to go to the son in the event of his becoming the purchaser at the appraised value of the stock and fixtures).

Letters testamentary were granted to Mrs. Whitman, Miss Whitman and Edward G. Whitman, Jr., and the appraisement fixing values as above, though stating items with much detail, was taken in the manner directed by the will. Mrs. Powell, it is true, who, with her husband, Samuel W. Powell, was living, as the auditing judge infers from letters which were in evidence, in Media, was not asked to unite with her mother and sister in the selection of one of the appraisers, but she stated that she would have selected the one whom they named, and expressed her satisfaction with the inventory and appraisement by joining with the other parties in interest, including her brother, in a written approval.

The son had been manager or foreman of the business for many years before the death of the decedent, receiving a salary of $20.00 per week. He was, of course, familiar with the manner in which it was conducted. Owing, perhaps, to increased competition, it had ceased to be as profitable as it once was, and Mrs. Powell and her husband were apprehensive that its continuance might result in disaster. This was also the opinion of Arthur M. Burton, Esq., acting as their counsel, though in a friendly rather than on a professional basis, and it was suggested that it would be better to create a joint stock company, with an allotment of stock to the parties according to their respective interests. Mrs. Powell's interest, however, was but two ninths, and the others, viz : her mother, sisters and brother, thought they had no right to disregard the wishes of the testator. It was, therefore, continued without interruption, the son acting as manager, and the mother, from time to time, advancing such moneys as were required to pay debts, replenish stock, etc., and for the year succeeding the death of the testator interest at the rate of six per cent was paid upon the appraised value of the business, in accordance with the direction of the will, and duly distributed, Mrs. Powell asking for and receiving her share. But it became evident as time passed that the business was not earning profits, that it was falling behindhand, but it was hoped that the trouble would be but temporary and that if it could be outlived there might be a return of prosperity. Business creditors, however, were becoming clamorous, and finally, after obtaining extensions from time to time, it became necessary, in order to save from the wreck some of the moneys she had advanced for the purposes of the estate, to issue executions on the judgments held by Mrs. Whitman, and what was left of the stock and fixtures was sold by the sheriff at public sale conducted by M. Thomas & Sons, realizing but a small fraction of the debt, and leaving unpaid altogether debts contracted in the course of carrying on the business after the decedent's death to the amount of several thousand dollars.

Mr. Lyle, on behalf of Mrs. Powell, contended that the accountants were not protected by the provision of the will with regard to continuing the business; that under any circumstances, there was no right to borrow money or to use any part

of the estate outside of the business for the purpose; that the management was reckless and without proper accounts; and that Edward G. Whitman, Jr., or if he alone were not responsible, all the accountants should be now charged with the stock and machinery at the appraised value and the value of the real estate sold; and, after crediting only payments of debts existing at the death of the testator, funeral expenses and expenses of administration, that two ninths of the balance should be awarded to her.

The estate of a decedent at the moment of his death becomes assets for the payment of his creditors, and no provision in his will can. impair their rights. As against them, therefore, his executors would be liable for loss arising from carrying on his business, except for the purpose of winding it up, no matter how explicitly this should be directed by the will. But as against legatees a very different principle applies. They are mere volunteers, having such rights only as the testator chooses to give them. He is dealing with his own and may do with it as he pleases. Those who accept the benefits of his will cannot repudiate any of its provisions. It is true that executors carrying on a business under the directions of a will become personally bound for debts thus incurred, but they have the right to resort to the estate for indemnity, and the estate itself may become liable, as a trust fund, to creditors with whom it has dealt in the course of the business. Of course where the executor undertakes to carry on or continue the business of the testator, he must be able to show positive and distinct authority conferred by the will, and creditors with whom he deals have no claim beyond that part of the estate which the will has authorized to be so used (Ex parte Garland, 10 Vesey, 110; Burwell v. Mandeville, 2 Howard, 560; Jones v. Walker, 103 U. S. 444); but here the direction is most explicit, and the question is not complicated by any question of partnership and separate property. The business was that of the testator individually, and except his liability for the rent ($480 per annum) of the house in which he resided his only debts were those which had arisen in carrying it on. They amounted at the time of his death to about $5,000, and the rent of the building where it was conducted was $6,500 per annum, under a lease not terminating until nearly a year after his death. His residuary estate,

which was the only part in which Mrs. Powell had an interest under the will, consisted only of the business and the property employed in it and the vacant lots in West Philadelphia. The direction to sell the lots was no less explicit than the direction to continue the business—the purpose of the sale being "for the payment of my debts" (there being practically none but those of the business) "and the distribution of my estate"— the proceeds of sale being directed to "be used and applied according to the uses, ends and purposes set forth and declared in this my will," one of the purposes set forth in the will being "that the stock, capital and property of my said business shall be maintained by my executors during the said period of two years in the same relative condition as to value as the same shall be at the time of my decease."

The direction to carry on the business for two years implies the authority to do whatever may be required for that purpose. Quando aliquid mandatur, mandatur et omne per quod ad illud pervenitur. Hence, if the exigencies of the business demanded that money should be borrowed, the executors had the right to borrow and give the requisite security to the lender. The testator himself had been in the habit of borrowing for this purpose, and he knew that the business, in the condition in which it was, could not be carried on without it. In Mathews v. Stephenson, 6 Pa. 496, it was said that "a power to contract debts upon the credit of the fund or property . . . . would seem to be necessarily implied in a general power to carry on a store."

That the lender was one of the executors is immaterial. She had an individual interest in the estate to the extent of one third, and if no security had been given to her she would at least have become entitled to be subrogated to the position of the creditors whose debts were discharged by the use of her money: Williamson's Appeal, 94 Pa. 231; Wilkins's Estate, 9 Watts, 132; Kelchner v. Forney, 29 Pa. 47; McKerrahan v. Crawford, 59 Pa. 390. It is true that Mrs. Powell did not want her mother to lend her money; but this was not because she questioned the right of the executors to borrow, or because she thought the money was not needed, but because of the risk which she feared her mother was running, and when told that "she would be amply secured and would get every

cent back for anything put into the business," there was no further objection. The method of securing, as will presently be seen, was by giving judgment notes for the amount of the respective loans. Even, therefore, if the will did not give, as it did, ample authority for what was done, Mrs. Powell would have no right to complain. Where an executor deals with the assets in a way not usual or strictly legal, the persons by whose request or assent it was done will not be permitted to charge him with maladministration : Poole v. Munday, 103 Mass. 176. And not only did Mrs. Powell make no objection to borrowing for the purposes of the business, but she asked for and received her share of what was distributed of the six per cent on the valuation of the appraisers in accordance with the provisions of the will.

The direction that the business should be carried on for two years made the administration of the estate one of peculiar difficulty. In ordinary cases executors know that creditors cannot compel payment until the expiration of a year; but if payment had been thus delayed by these executors the debts, as already stated, the debts of the business, credit would have been destroyed, and the carrying out of the provisions of the will made impossible. The debts amounted to about $5,000, and there was, in addition, a monthly rent, accruing under a lease to the testator of $541.67 ($6,500 per annum), which of course had to be met with absolute punctuality; and to meet all this, irrespective of wages of persons employed in the business, expenses of keeping up stock, etc., the cash on hand, January 1, 1893, was but $2,615.21.

It was under these circumstances that Mrs. Whitman made her loans to the estate, receiving as security judgment notes of the executors, viz : January 1, 1893, $2,500; June 2, 1893, $1,000; June 7, 1893, $3,500, and November 6, 1883, $250, which, as all parties in interest believed, secured her perfectly, there being then no idea of insolvency. The moneys thus loaned came from a policy of insurance belonging to her on the life of her husband, and every dollar, as the evidence showed, was used for payment of debts, payment of rent, or for purposes essential to the carrying on of the business.

There were still other complications. The widening of Chestnut street above Eighth had been directed by the city, and in

consequence the lessors of the building, 812 Chestnut street, gave notice to quit at the end of the current year, September 1, 1893. This made it necessary that another place should be secured, and a contract was entered into for leasing property on Second street at $100 per month, beginning June 1, 1893. The factory was removed to this place in June, but in July, before the removal of the store, the order widening Chestnut street was postponed or extended for another year, and the lessors of 812 Chestnut street offered to lower the rent to $483.34 per month if the executors would remain until May, 1894; and as it was believed that a larger and more successful business could be done, in view of the approaching holiday season, there than on Second street, the offer was accepted. The removal of the factory, of course, involved considerable additional expense.

The arrangement with the lessors of 812 Chestnut street ended in May or June, 1894, and as the Second street property (above Arch street) was found not adapted to the business as it had been carried on in the lifetime of the testator, the store was removed to 1013 Chestnut street, at a rent of $291.67 per month.

About this time, or, perhaps, at an earlier date, there began to be difficulty in paying expenses and meeting the claims of creditors arising in carrying on the business since the death of the testator. A meeting of creditors was held in May, 1894, at which an exact statement of the condition of affairs was made on behalf of the estate—the fact that Mrs. Whitman held judgment notes for the amount of her loans being, according to the testimony, distinctly mentioned. The extension asked for was agreed to, and in June, 1894, two of the lots in West Philadelphia were sold under the direction contained in the will for $1,500, and the amount used in the effort to keep up the business. The condition of affairs was fully understood by the family. On February 12, 1894, Mrs. Powell wrote to her brother, Edward G. Whitman, Jr.: "I did not write Saturday evening because I had neither stamp nor postal card on hand. The statement is satisfactory as it is, so send it as soon as you can. Let me know as soon as you know yourself about getting the money, and upon no consideration show any signs of weakening to these people to whom you owe money. Tell them you

are going to get it, for get it you must some way.  Let me hear from you as soon as you know.  I am sure you will be able to pull through.  Affectionately, your sister, Estella."

The effort to "pull through," however, was not successful. Matters went from bad to worse.  There was another meeting of creditors in the early part of 1895, and it being manifest that there would be no further indulgence, Mrs. Whitman's judgments were entered up and under executions issued upon them, such property as remained (some having been sold to Ruby & Adamson at private sale) was sold by the sheriff, as already stated, for an amount far less than the debt to her. Most of the property sold was purchased by Mrs. Whitman, by whom an attempt was made to continue the business on her own account; but it did not yield enough to pay rent, and, in the end, which came very soon, everything was swept away by a constable's sale under a distraint.

It is not pretended, certainly is not shown, that the accountants did not act in perfect good faith and with an honest effort to carry out the provisions of the will successfully.  To the son success was of vital importance.  He gave his entire time and attention to the management of the business, going to the store early every morning and remaining until the close of the day, often late in the evening, practically without compensation, though while the testator lived he had received a salary of $20.00 per week.  Mrs. Whitman, who has lost not only her share (one third) of the residuary estate, but also the greater part of the money advanced in the effort to continue the business, makes no complaint, nor does her daughter, Miss Whitman, whose interest is precisely the same as that of Mrs. Powell.  They both knew that the loss was one which, without disregarding altogether the directions of the testator, could not have been avoided, and that the mistake, as expressed by Mr. Burton in his testimony before the auditing judge, "was when the testator directed the business to be carried on."

Executors or trustees are never responsible for losses not occasioned by their own negligence or wilful default.

It is said, however, that the proper books of account were not kept by the accountants in carrying on the business, and that they ought to have known at an earlier day that they were carrying it on at a loss.  The books, however, were precisely

the books which had been used by the testator himself during all the time that he was in the business; every item, both of debit and credit, was carefully and faithfully entered in them; and the method of conducting it was just what it had been during his lifetime.  It may be that a scientific bookkeeper could criticise the style of bookkeeping, but scientific bookkeeping is not demanded on the part of fiduciaries; accuracy is all that is required.  The account which these executors have filed shows the receipt in cash, from all sources, of $65,205.49, the expenditure of which is set forth with minute detail in the restated account.  The items of this account are taken from the books kept in the business, and it is not alleged that it fails to debit anything received or that it claims credit for anything not actually paid.  A stock book which at one time existed was destroyed in a fire which occurred at 1013 Chestnut street in May, 1895, numerous receipts being lost at the same time, but the account was carefully gone over before the auditing judge, and every item as to which it was asked, was fully explained.

In the opinion of the auditing judge the accountants, individually or collectively, are not chargeable as contended for by Mrs. Powell, and as the account shows a balance in their hands of only $261.64, which is insufficient for payment of counsel fees and commissions, no award in her favor can be made.

Claim was presented by Mr. Drake on behalf of Reiff, Howell & Company for $459.69 for goods sold to the accountants during the time they were so carrying on the business, viz: in February, March, April and December, 1894, it being contended that as against other creditors of the business the judgments given to Mrs. Whitman were void under the principle declared in Woddrop v. Weed, 154 Pa. 307, and Young v. Weed, 154 Pa. 316.  In these cases it was held that judgments confessed by a trustee under a trust for carrying on business, after the estate had become insolvent, in favor of a general creditor, was void as against other general creditors, while here the giving of the judgment was part of the contract under which the loans were made and took place not only before insolvency but before the debt to the claimant was contracted.  But the question is not now an open one so far as this claimant is concerned, having been decided adversely by the court of common pleas No. 1, of December term, 1895, No. 1149, under a bill in equity

filed by the claimant to restrain the sale by the sheriff under the judgment given to Mrs. Whitman.  The claim is dismissed.

It need only be added that the levy under Mrs. Whitman's execution included the West Philadelphia lot not sold by the executors, which was bought by her for $50.00 and subsequently sold for $800.  Her rights as between herself and creditors of the business have, as already stated, been determined by the court of common pleas, while so far as Mrs. Powell is concerned the case is governed by the principle declared in Williamson's Appeal, supra, and Poole v. Munday, supra.  And even if it should be held that she is accountable to the estate for what she received upon her sale of the lot, $800, she would be entitled as creditor to retain it, there being still due her, as shown by the statement presented by Mr. Lex and hereto annexed, $6,355.50.

Moreover the account contains no credit for commissions to the accountants or for counsel fees, and the only reason for not allowing both is the fact that the balance, even if increased by the amount of gain on resale of the lot, is wholly insufficient for payment, while there is no other fund that can be resorted to.  That the estate has been swept away in the effort to carry out the provisions of the will does not affect the question, the executors, in the opinion of the auditing judge, not being responsible for the result.  They acted in good faith and incurred great personal responsibility, one of them giving his entire time and services for a period of over two years.  An allowance of five per cent on the receipts, with counsel fees to Mr. Wakeling, $500, would be proper and reasonable.

*John G. Johnson*, with him *M. V. Simpson*, for appellant.— The general assets of an estate cannot be subjected to the carrying on of the business by mere implication: Burwell v. Mandeville, 2 How. 560; Ex parte Garland, 10 Vesey, 110; Jones v. Walker, 103 U. S. 444.

If the direction is to continue the testator's capital in the business it will not authorize liabilities or render the estate liable beyond the amount invested at testator's death: Pitkin v. Pitkin, 7 Conn. 307; Cook v. Admr., 3 Fed. Rep. 69; Ferry v. Laible, 27 N. J. Eq. 146; McNeillie v. Acton, 2 Equity Rep. 21.

*Samuel Wakeling*, for appellees, cited Semple's Est., 189 Pa. 385.

OPINION BY MR. JUSTICE FELL, March 12, 1900:

The assignments of error are to the refusal of the court to surcharge the accountants with the amount of losses incurred in carrying on the business of the testator under the direction of his will. There is no question of partnership and separate property or of the rights of creditors to be considered. The business was the individual business of the testator, and the appellant is a daughter who shares in the residuary estate only.

The business in which the testator was engaged had been conducted by him for about twenty years, and he desired to preserve it for his family. His will contained mandatory directions to his executors to carry on the business for two years and he directed that the stock, capital and property should be maintained in the same condition as to value as that in which it was at the time of his death. His entire estate, except his household furniture and three vacant lots of land, consisted of the stock, machinery, fixtures and book accounts of his business. His debts, excepting that for the rent of the house in which he lived were all debts of his business. He directed that the lots should be sold and the proceeds used for the purposes mentioned in his will. For years he had borrowed money in order to carry on his business, and at his death owed borrowed money, and he must have known that his executors would be obliged to borrow in order to carry out his directions.

The accountants acted in entire good faith, and with at least ordinary prudence. The business was not prosperous when it came into their hands. They were at the beginning of a period of great business depression and distrust. They encountered unexpected difficulties because of the necessity of removing the factory, a matter over which they had no control and which could not have been foreseen by them. All that they did in the conduct of the business was fully known to all the parties in interest, and it was done without objection from any of them. Much of which complaint is now made by the appellant, she at the time insisted should be done. She had drawn

her share of the profits as long as profits were made, and in the early part of 1894, knowing the danger which threatened the business, she wrote to one of the accountants urging him to raise money in order to save it.   Under these circumstances, if her rights were as high as those of a creditor of the estate, she would have little room for complaint; as it is she has none whatever.

The decree of distribution is affirmed at the cost of the appellant.